# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| In the Matter of the Search of:<br>Information associated with account<br>"tianyy766@gmail.com" within the possession,<br>custody, or control of Google, LLC. | Case MJ No. 2:22-MJ-4659 |

**APPLICATION FOR WARRANT PURSUANT TO 18 U.S.C. § 2703**

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

☒ Evidence of a crime;
☐ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| Code section(s) | Offense Description |
|---|---|
| 18 U.S.C. §§ 1030; 1343 | Computer Fraud; Wire Fraud |
| 18 U.S.C. §§ 1956; 1957 | Money Laundering |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

ERIC BROWN
_____
**Attested to by the applicant in accordance with the
requirements of Fed. R. Crim. P. 4.1 by telephone**

_____
Eric Brown, Special Agent, HSI
*Printed name and title*

Sworn to before me telephonically, in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: _____

City and State: _____

_____
*Judge's signature*
Hon. Jacqueline Chooljian, U.S. Magistrate Judge
*Printed name and title*

AUSA: Dan G. Boyle (213-894-2426)

## <u>ATTACHMENT A</u>

**PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the SUBJECT ACCOUNT identified as tianyy766@gmail.com, associated with Google Account ID 465899734138, that is within the possession, custody, or control of Google LLC, a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, California, regardless of where such information is stored, held, or maintained.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

## I. SEARCH PROCEDURES

1.    The warrant will be presented to personnel of Google LLC (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.    To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.    The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.    With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.  The review of the electronic data may

be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

6.   The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.   Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court.  Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.   The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.   Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

II.   **INFORMATION TO BE DISCLOSED BY THE PROVIDER**

10.   To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT, limited to that which occurred between January 8, 2022[1] and the date of this warrant,[2] including:

i.   All emails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored

---

[1] The date the SUBJECT ACCOUNT was created.

[2] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

or preserved copies of messages sent to and from the account, draft messages, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each email or message (including the actual IP addresses of the sender and recipients of the emails), and any related documents or attachments.

ii.  All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

iii. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

b.  All other records and information, including:

i.  All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or email addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment,

including detailed billing records, and including any changes made to any subscriber information or services, including specifically changes made to secondary email accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the following accounts:

(I)  the SUBJECT ACCOUNT, and

(II) any other account associated with the SUBJECT ACCOUNT by means of sharing a common secondary, recovery, or alternate email address listed in subscriber records for the SUBJECT ACCOUNT or by means of sharing a common phone number or SMS number listed in subscriber records for the SUBJECT ACCOUNT.

ii.  Any and all logs of user activity and user agent string, including:  web requests or HTTP requests; any logs containing information such as the Requestor's IP address, identity and user ID, date and timestamp, request URI or URL, HTTP protocol version, referrer, and other user agent string information; login tracker logs; account management logs; and any other information concerning other email or social media accounts accessed by or analytics related to the SUBJECT ACCOUNT.

iii. Any and all cookies used by any computer or web browser associated with the SUBJECT ACCOUNT, including the IP addresses, dates, and times associated with the recognition of any such cookie;

iv.  All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made.

v.  Any information identifying the device or devices used to access the SUBJECT ACCOUNT, including any Android ID, Advertising ID, unique application number, hardware model, operating system version, unique device identifier, Global Unique Identifier or "GUID," serial number, mobile network information, phone number, device serial number, MAC address, Electronic Serial Number ("ESN"), Mobile Electronic Identity Number ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Number ("MIN"), Subscriber Identity Module ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifier ("IMSI"), International Mobile Equipment Identity ("IMEI"), or Apple advertiser ID or ID for advertisers ("IDFA") or Google's AAID or any other advertiser ID, and any other information regarding the types of devices used to access the SUBJECT ACCOUNT or other device-specific information, including the device type, brand name, device mode or operating system, and first and last times that a device were observed.

vi.  Any information showing the location of the user of the SUBJECT ACCOUNT, including while sending or

receiving a message using the SUBJECT ACCOUNT or accessing or logged into the SUBJECT ACCOUNT.

## III.  **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

11.  For the SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

a.   All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1030 (Computer Fraud), 1343 (Wire Fraud), 1956 (Money Laundering), 1957 (Monetary Transactions in Criminally Derived Property), or a conspiracy to commit the same, (the "Subject Offenses"), namely:

i.   Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

ii.   Information related to how and when the SUBJECT ACCOUNT was accessed or used;

iii.  Information related to the purchase, registration, maintenance and/or administration of https://defi.etc-defi909.xyz or other similar domains which are spoofed websites of Compound Labs doing business as Compound DeFi;

iv.   Information related to victims of the liquidating mining scam, including known victims M.A., I.A., B.J., S.B. and R.N. and unidentified victims.

v.   Information related to the proceeds of liquidity mining scams, including the creation and use of bank,

financial and cryptocurrency accounts, and records related to cryptocurrency, bank, and wire transactions;

        vi.   Records, documents, programs, applications, or materials referring to or containing the personal identifying information of any conspirator, such as names, addresses, phone numbers, credit and debit card numbers, security codes, bank account and other financial institution account numbers, Social Security numbers, and email addresses.

        vii. Information related to the location, storage, or concealment of cash, money instruments, virtual currency, or other money equivalents;

        viii.   Information related to co-conspirators engaged in the Subject Offenses, which could include information relating to their identities, whereabouts, communications, and methods of contact and communication.

    b.   All records and information described above in Section II.10.b.

## IV.   PROVIDER PROCEDURES

    12.   IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  The PROVIDER shall send such information to:

        Special Agent Eric Brown
        501 W. Ocean Blvd, Suite 7200, Long Beach, CA 90802
        Phone: 562-519-8683
        Email: eric.t.brown@ice.dhs.gov

13.   IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant. IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b), that the PROVIDER shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant, until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date this warrant is signed by the magistrate judge or such later date as may be set by the Court upon application for an extension by the United States.  Upon expiration of this order, at least ten business days prior to disclosing the existence of the warrant, the PROVIDER shall notify the agent identified in paragraph 12 above of its intent to so notify.

## AFFIDAVIT

I, ERIC T. BROWN, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.  I am a Special Agent ("SA") with Homeland Security Investigations ("HSI") and have been so employed since February 2019.  I am currently assigned to the Los Angeles Cybercrimes and Incident Response Team ("CIRT") where I primarily investigate cybercrimes and cyber-enabled crimes, including network intrusion, ransomware, business e-mail compromise, wire fraud, identity theft, credit card fraud and money laundering. Prior to becoming an SA with HSI, I was employed as an SA and Supervisory Special Agent with the Ohio Bureau of Workers' Compensation for approximately eight years where I conducted numerous investigations of fraud schemes.  I have received both formal and informal training from HSI and other institutions regarding cyber- and financial-related investigations, digital currencies and computer forensics.  I have a master's degree in business administration and have been a Certified Fraud Examiner since 2013.

2.  I make this affidavit in support of an application for a warrant for information associated with the account identified as tianyy766@gmail.com, associated with Google Account ID 465899734138 (the "SUBJECT ACCOUNT"), that is stored at premises controlled by Google LLC (the "PROVIDER"), a provider of electronic communication and remote computing services, headquartered at 1600 Amphitheatre Parkway, Mountain View,

California.[1]  The information to be searched is described in

Attachment A.  This affidavit is made in support of an

application for a warrant under 18 U.S.C. §§ 2703(a),

2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER

to disclose to the government copies of the information

(including the content of communications) described in Section

II of Attachment B.  Upon receipt of the information described

in Section II of Attachment B, law enforcement agents and/or

individuals assisting law enforcement and acting at their

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information--but not content--pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (see Attachment B paragraph II.10.a.) as well as subscriber records and other records and information that do not contain content (see Attachment B paragraph II.10.b.).

direction will review that information to locate the items described in Section III of Attachment B.  Attachments A and B are incorporated herein by reference.

3.    As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNT constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of 18 U.S.C. §§ 1030 (Computer Fraud), 1343 (Wire Fraud), 1956 (Money Laundering), 1957 (Monetary Transactions in Criminally Derived Property), or a conspiracy to commit the same, (the "Subject Offenses").

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

## II.  <u>SUMMARY OF PROBABLE CAUSE</u>

5.    HSI is investigating a scamming group that is using false or "spoofed" websites to trick victims into investing digital currency in a purported decentralized finance ("DeFi") company called "Compound DeFi."  Through these spoofed websites,

the scammers use malicious mobile apps and smart contracts to
obtain control of victims' digital currency wallets.  Initially,
the scammers will deposit small amounts of digital currency into
a victim's wallet in order to create the appearance of a
profitable investment, and thus encourage the victim to invest
more digital currency and to share the spoofed website with
their family and friends.  Eventually, the scammers will
withdraw all digital currency from the victim's wallet.
Finally, when victims attempt to complain about losing their
digital currency, the scammers ask the victims to deposit
additional funds to unfreeze their funds.  In actuality,
Compound DeFi is a fraud, using the branding of a well-known
DeFi company to trick victims into investing, then using
invested funds from victims to pay rewards to new victims in a
Ponzi-like scheme, before ultimately stealing all of a victim's
funds.

6.   The spoofed websites used to facilitate the scam were
registered using and account with GoDaddy, Inc.  The GoDaddy
account was created using the SUBJECT ACCOUNT.  The SUBJECT
ACCOUNT contained email content from GoDaddy, along with
location, web activity and Android device information that may
uncover the identity of the perpetrator(s) committing the scam.
As set forth below, there is probable cause that information
associated with the SUBJECT ACCOUNT constitutes evidence,
contraband, fruits, or instrumentalities of violations of the
Subject Offenses.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    Background on Digital Currency**

7.    Digital currency (also known as virtual currency or cryptocurrency)[3] is generally defined as an electronic-sourced unit of value that can be used as a substitute for fiat currency (*i.e.*, currency created and regulated by a government).  Digital currencies exhibit properties similar to other currencies, but do not have a physical form, existing entirely on the internet. Digital currency is not issued by any government or bank (in contrast with fiat currencies) and is instead generated and controlled through computer software operating on a decentralized peer-to-peer network, often referred to as the blockchain or public ledger.  Digital currency is legal in the United States and accepted for legitimate financial transactions.  However, digital currency is often used for conducting illegal transactions or for concealing or disguising the true nature, source, location, ownership or control of illegally obtained proceeds.  Bitcoin ("BTC") is one of the most commonly used and well-known digital currencies.  Ethereum ("ETH") is another popular and commonly used digital currency.

8.    A stablecoin is a digital currency whose market value is attached to or "pegged" to another stable asset.  Differing from normal digital currencies, the value of stablecoins are pegged to assets such as fiat currencies like the United States Dollar ("USD") or the Euro, or other types of assets like

---

[3] For purposes of this affidavit, the terms "digital currency," "cryptocurrency," and "virtual currency" are used interchangeably and address the same concept.

precious metals or other digital currencies.  Stablecoins are thus used to mitigate the volatility in the price of digital currency by mimicking the value of a fiat currency, without actually converting digital currency into fiat. While there are various legitimate uses for stablecoins, they are popular with cyber-criminals who seek to hold digital currency proceeds of crime at a stable or near-fixed value without moving those funds into the traditional financial system in a fiat currency such as USD. Some examples of stablecoins include:

     a.   Tether ("USDT") was developed by Tether Limited Inc. and is designed to maintain its value at $1.00 USD.  USDT can utilize the existing ETH blockchain or the newer TRON ("TRX") blockchain.

     b.   Binance USD ("BUSD"), which was developed by Binance Holdings Limited and Paxos Trust Company, LLC, is designed to maintain its value at $1.00 USD.  BUSD utilizes the existing ETH blockchain.

    9.   A digital currency exchange (an "exchange") is a business that allows customers to trade digital currencies for other digital or fiat currencies.  An exchange can be a brick and mortar business, or strictly an online business.  Both brick and mortar and online exchanges accept a wide variety of digital currencies, and exchange them for fiat and traditional payment methods, other digital currencies, or transfers between digital currency owners.  Most exchanges are located outside the boundaries of the United States in order to avoid regulation and legal requirements, but some popular exchanges operate inside

the jurisdiction of the United States.  Binance is a popular online exchange that is located outside of the United States but cooperates with and accepts legal process from American law enforcement agencies.

10.  A wallet is a means of storing digital currency identified by unique electronic addresses that allows an individual to conduct transactions on the public ledger.  To access a wallet on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key").  The public address can be analogized to an account number while the private address is similar to a password used to access that account.  Even though the public address of those engaging in digital currency transactions are recorded on the public ledger, the true identities of the individuals or entities behind the public address are not recorded.  If a real individual or entity is linked to a public address, however, it may be possible to determine what transactions were conducted by that individual or entity.  Therefore, digital transactions are often described as "pseudonymous," meaning they are partially anonymous.  Most individuals are identified when they use a digital currency exchanger to make a transaction between digital currency and fiat, or through digital currency exchangers that voluntarily or through legal order, cooperate with law enforcement.

11.  Smart contracts are digital contracts stored and distributed across a blockchain network.  Smart contracts are computer programs or lines of code that run when predetermined

conditions are met.  These contracts permit trusted transactions, agreements, and workflows to be carried out among disparate, anonymous parties without the need for a central authority, legal system, or external enforcement mechanism.

**B.    Background on Liquidity Mining Scams**

12.  Liquidity mining is an investment strategy used to earn passive income with digital currency.  In legitimate liquidity mining operations, investors place (or "stake") their cryptocurrency in a liquidity pool, which is then used to facilitate decentralized trading and lending.  A liquidity pool is thus a collection of digital currency, often grouped together into a smart contract, which then facilitates other third-party digital currency transactions. Users who deposit funds into a liquidity pool are known as liquidity providers ("LPs").  A user's contribution to the liquidity pool is represented through "LP tokens," which are a form of digital currency created and awarded to users who deposit assets in a liquidity pool and represent the share of the liquidity pool that an LP owns.  LP token holders usually receive a percentage of the liquidity pool's trading fees as an award.

13.  An automated market maker ("AMM") is a fully automated decentralized exchange where trades are made against a liquidity pool.  An algorithm regulates the values and prices of the assets in the liquidity pool.  AMMs allow digital assets to be traded in a decentralized fashion by using liquidity pools instead of a traditional market of buyers and sellers.  AMMs create the demand and need for liquidity pools, and thus fulfill

the roles typically played by large financial institutions in
ordinary securities transactions.

14.  A decentralized application ("dApp") is a type of
distributed open-source software application that runs on a
peer-to-peer ("P2P") blockchain network rather than on a single
computer. dApps are visibly similar to other software
applications that are on a website or mobile device but utilize
on a P2P backend network.  dApps rely on wallet software to
interact with automated smart contracts supported on blockchain
networks.

15.  In fraudulent liquidity mining operations, scammers
typically target potential victims through direct messages
("DMs") on social media and dating applications, or through
word-of-mouth from victims currently using the service.
Scammers do not differentiate between individuals who own or do
not own cryptocurrency, as they direct victims who do not
already own cryptocurrency to set up an account with a wallet
service and purchase cryptocurrency.  These scams typically do
not require a minimum investment, allowing the victims to
"invest" any amount they want.

16.  In the DM approach, scammers send out unsolicited
messages to potential victims through social media or messaging
services.  The scammer engages the victim in conversation and
attempts to initiate a personal or professional relationship,
building trust over a period of days to weeks.  During this
period, the scammer will bring up the topic of cryptocurrency
investment opportunities, including liquidity mining.  The

scammer states they have used this technique for a long time and have seen an amazing return on investment.  The scam is not immediately apparent, since the overall conversation is two people trying to get to know each other.

17.  In the word-of-mouth approach, victims who have already invested into the scammers' liquidity mining are initially paid what appear to be returns on their purported investment, thus building a false sense of security in the legitimacy of the investment, which encourages these victims to continue "investing" additional cryptocurrency and tell their contacts about this lucrative investment opportunity, thus bringing more victims into the scam.  Once enough victims are invested, the scammers empty all of the victims' wallets.

18.  Whatever recruiting method is used, potential victims who express an interest in the so-called investment receive a link from the scammers to what appears to be a liquidity mining application.  In order to begin investing, the victim must activate the link and then connect a cryptocurrency wallet to the application provided by the scammers. The victim is then instructed how to connect their cryptocurrency wallet to the purported liquidity mining operation by clicking a button to receive a so-called mining certificate (or voucher, or node), in exchange for a small fee.  A pop-up designed to mirror the interface of the wallet application presents a list of permissions it is allegedly requesting.  By clicking the link and accepting the permissions presented, however, the victim has unwittingly authorized the scammers to withdraw an unlimited

amount from the victim's wallets without permission or notification.

19.   The scammers will typically then deposit small amounts of digital currency (often obtained from other victims in a Ponzi-like method) into the victim's wallet as a reward for their investment.  Believing their investments to be a success, victims will often purchase additional cryptocurrency to invest. Ultimately, the scammers will move all of a victim's stored cryptocurrency and investments to a scammer-controlled wallet, without notifying the victim or seeking permission.

20.   Once the victim's digital currency is stolen, some victims may contact the customer service portal on the liquidity mining application.  Scammers purporting to be customer service representatives will then present explanations as to where the victim's digital currency went and why it is no longer accessible, ultimately suggesting that the victim needs to deposit additional funds in order to receive their original digital currency back.  However, victims are unable to reclaim their original funds even if they add additional funds as directed, and any new digital currency deposited will be stolen as well.

C.   **Victim M.A. Loses Digital Currency in the Scam**

21.   Based on conversations, emails and reports filed by M.A., I learned the following:

        a.   M.A. resides in, and does business in, Orange County, California.

b.    On or about June 14, 2022, M.A. received a link (https://defi.etc-defi909.xyz) from a friend to what was subsequently determined to be a spoofed website for "Compound DeFi" (the "Spoofed Website").  It was M.A.'s understanding from this friend that Compound DeFi rewarded users every six hours for holding USDT in a Compound DeFi specified wallet.  M.A. opened the Spoofed Website on his cell phone, which then connected to M.A.'s Coinbase wallet on his cell phone.  M.A. did not sign up for anything nor did he knowingly give permission for Compound DeFi to transfer digital currency from his wallet. At that time, M.A. had approximately $168,000 worth of digital currency in his Coinbase wallet.

c.    On June 26, 2022, M.A. opened his Coinbase wallet on his phone and noticed that his digital currency was transferred out of the wallet without his knowledge and permission.

22.   Based on my training and experience, I believe M.A. was victimized by a liquidity mining scam committed by the scammers in violation of the Subject Offenses.

**D.    Victim I.A. Loses Digital Currency in the Scam**

23.   Based on conversations, emails and reports filed by I.A., I learned the following:

a.    I.A. received a link to the Spoofed Website for Compound DeFi from his friend "S.B." (another victim involved in this scheme).  I.A. understood that this service would reward I.A. every six hours for holding USDT in his Coinbase wallet.

I.A. believed no digital currency would be transferred from his Coinbase wallet to join Compound DeFi.

b.   I.A. invested approximately $92,000 worth of digital currency with Compound DeFi.  According to the Spoofed Website, I.A. saw his investment growing rapidly, which led I.A. to contact Compound DeFi support and receive a referral code to sign up his friends.  I.A. shared Spoofed Website and his referral code with several of his friends.

c.   On June 26, 2022, I.A. noticed that all the digital currency in his Coinbase wallet was transferred away without his knowledge or consent.

24.  Based on my training and experience, I believe I.A. was victimized by a liquidity mining scam committed by the scammers in violation of the Subject Offenses.

**E.   Victim B.J. Loses Digital Currency in the Scam**

25.  Based on conversations, emails and reports filed by "B.J.", I learned the following:

a.   B.J. received a link to the Spoofed Website for Compound DeFi from his friend I.A.  B.J. understood that Compound DeFi would offer him a reward for keeping USDT in his digital currency wallet.  B.J. trusted I.A. and assumed that Compound DeFi was a legitimate service.  B.J. invested approximately $40,000 worth of digital currency.

b.   On June 26, 2022, B.J. noticed that all of the digital currency in his wallet had been transferred without his knowledge or consent.

c.   B.J. contacted Compound DeFi and was advised that his account was locked.  B.J. was informed that he needed to deposit 40% of his investment into his wallet in order to unlock his purportedly-frozen account.  B.J. did not invest any additional digital currency.

26.  Based on my training and experience, I believe B.J. was victimized by a liquidity mining scam committed by the scammers in violation of the Subject Offenses.

**F.   Victim S.B. Loses Digital Currency in the Scam**

27.  Based on conversations, emails and reports filed by S.B., I learned the following:

a.   S.B. received a link to the Spoofed Website from a friend.  S.B. understood that Compound DeFi would offer him rewards for keeping USDT in his linked wallet.

b.   S.B. joined a group chat on WhatsApp which was led by "Erica" and consisted of other investors.  Erica posted tutorial videos and screenshots of her account to give others in the group motivation to invest.

c.   On June 26, 2022, S.B. noticed that all the digital currency in his wallet was transferred without his knowledge or consent.

d.   S.B. reviewed the group chat and observed that other group members lost their funds, including Erica.  When S.B. asked Erica about the loss of funds, Erica responded that she lost more money than everyone else.  A chat member indicated to S.B. that he had reviewed Erica's purported digital currency

wallet, and that screenshots Erica had posted to the group chat appeared to be false.

28.   Based on my training and experience, I believe S.B. was victimized by a liquidity mining scam committed by the scammers in violation of the Subject Offenses.

**G.   Victim R.N. Loses Digital Currency in the Scam**

29.   Based on conversations, emails and reports filed by "R.N.", I learned the following:

    a.   R.N. received a link to the Spoofed Website from his friend I.A. (as described above).  R.N. understood that Compound DeFi would offer him rewards for keeping USDT in his linked wallet.  I.A. told R.N. about how the site purported to work and about how other individuals had made money from Compound DeFi.  R.N trusted I.A. and took his word that Compound DeFi was legitimate.

    b.   R.N. linked the Spoofed Website to his MetaMask wallet and invested approximately $8,000 worth of digital currency.

    c.   On June 26, 2022, R.N. checked and his wallet and noticed that all the digital currency in his wallet was transferred without his knowledge or consent.

30.   Based on my training and experience, I believe R.N. was victimized by a liquidity mining scam committed by the scammers in violation of the Subject Offenses.

**H.   The Spoofed Website**

31.   On September 14, 2022, I visited the Spoofed Website and learned the following:

a.    The Spoofed Website was branded as Compound DeFi. It offered users to become USDT "miners."  The users' deposits would reportedly always be in the users' own wallet, and the Spoofed Website promised that users could withdraw their funds and interest earned at any time.  Furthermore, the Spoofed Website advertised example rate of returns based on amounts of USDT that users held in their digital currency wallet, and stated that the profit cycle is once every six hours.

b.    The Spoofed Website identified the following individuals as their leadership team:

Robert Leshner, CEO ("Leshner")
Geoffrey Hayes, CTO ("Hayes")
Torrey Atcitty, Application Lead ("Atcitty")
Coburn Berry, Senior Engineer ("Berry")

c.    The Spoofed Website was registered through GoDaddy.

32.  Based on open-source research, I learned that Leshner, Hayes, Atcitty and Berry were all employed by Compound Labs based in San Francisco, California.

33.  On August 22, 2022, I received a report from Leshner of an investigation conducted by Compound Labs.  The report stated that the Spoofed Website, as well as other similarly named domains, were phishing sites actively stealing cryptocurrency assets from victims using the name and brand of Compound Labs to commit these crimes.

34.  Based on information provided by GoDaddy, I learned the following:

a.    On January 8, 2022, an individual under the name "ahhi yangin" created a new account with GoDaddy (the "GoDaddy Account").  The individual provided the following contact information when opening the account:

Email Address: the SUBJECT ACCOUNT
Phone Number: +971 559800328
Address: tfygyuvdrc, wbuwbdbd, CHINA

b.    The GoDaddy Account owned 102 domain names.  Most of the domains were a variation of the Spoofed Website.

c.    All of the domains used webservers belonging to Alibaba[4] and were physically located in London, England.

d.    The domains were purchased using the payment processor AliPay[5] and the Chinese Yuan currency.

e.    The GoDaddy Account had logins from four different internet protocol ("IP") addresses.

35.  As previously discussed, the phone number +971 559800328 was used to open the GoDaddy Account.  Based on open-source research, this phone number belongs to the phone carrier Emirates Integrated Telecommunications Company PJSC in Dubai, United Arab Emirates ("UAE").

36.  As previously discussed, the GoDaddy Account was accessed by four IP addresses.  Based on open-source research, these IP addresses belong to the internet service provider

---

[4] Based on my training and experience, I know that Alibaba is a Chinese multinational conglomerate which has subsidiaries in e-commerce, cloud computing, financial and entertainment industries.

[5] Based on my training and experience, I know that AliPay is a subsidiary of Alibaba.

("ISP") DU Telecom and have geolocation data in Dubai and Sharjah, UAE.

37.  Based on my training and experience, I believe the Spoofed Website has played an integral part in the facilitation of the above-described liquidity mining pool scam, in that the Spoofed Website provided legitimacy to the scam by fraudulently using the branding of Compound Labs, a well-known decentralized finance company.  Additionally, the Spoofed Website enabled the scammers to prompt the victims for access to their digital currency wallets and sign a malicious smart contract which ultimately gave the scammers full control of the victims' digital currency wallets.  Therefore, I believe the GoDaddy Account was used by the scammers to commit violations of the Subject Offenses.

**I.   The SUBJECT ACCOUNT**

38.  As discussed previously, the SUBJECT ACCOUNT was used to create the GoDaddy Account, and there is probable cause to believe that the GoDaddy Account, which controlled the Spoofed Website, was used by the scammers to commit the liquidity mining scam described herein.

39.  Based on information previously provided by Google, I learned the following:

a.   The SUBJECT ACCOUNT was created on January 8, 2022 (the same day the GoDaddy Account was created) by an individual using the name "tiany yang."

b.   The terms of service language was in Chinese.

c.    The SUBJECT ACCOUNT had the following services: Gmail, Web and App Activity, Google Calendar, Location History and Android.

d.    The SUBJECT ACCOUNT is linked to an Android device - a Xiaomi Redmi 9 smartphone.  This device was set to the Chinese language and the time zone was set to Dubai.  The Android device had total of six different users – all of which are Google accounts.

e.    Based on an analysis of email header information, the SUBJECT ACCOUNT received emails from GoDaddy and Noon[6].

f.    Based on analysis and open-source research of IP addresses used to access the SUBJECT ACCOUNT, all the IP addresses belong to ISP DU Telecom with geolocation in Dubai, UAE.

40.   Based on my training and experience, I submit there is probable cause to believe that the GoDaddy Account was created and managed using the SUBJECT ACCOUNT.  Additionally, the SUBJECT ACCOUNT contained email content from GoDaddy.  Furthermore, the SUJBECT ACCOUNT contained Web and App Activity, Location History and Android Device information which could identify the true identities of the perpetrator(s) who created the GoDaddy Account and the SUBJECT ACCOUNT.  Therefore, I believe there is probable cause that information associated with the SUBJECT ACCOUNT constitutes evidence, contraband, fruits, or instrumentalities of violations of the Subject Offenses.

---

[6] Based on my training and experience, I know that Noon is an e-commerce platform based in Dubai, UAE.

41.  Other than what has been described herein, to my knowledge the United States has not attempted to obtain the contents of the SUBJECT ACCOUNT by other means.

**J.   Request for Preservation of Evidence**

42.  On September 13, 2022, a Preservation Request was served to the PROVIDER for records associated with the SUBJECT ACCOUNT for a period of 90 days.

## IV.   SERVICES PROVIDED BY GOOGLE

43.  Based on a review of information provided by Google regarding its services, information provided by other law enforcement officers, and my training and experience, I am aware of the information contained in this section of the affidavit regarding Google.

44.  Google provides a variety of online services, many through Google Accounts, including email, document storage, mobile operating systems, translation services, software coding tools, malware analysis, social media accounts, applications development tools, video and photograph sharing and storage, web feed management tools, personalized home pages, news aggregation tools, a Google Account "dashboard" tool, an online retail storefront offering applications for free and for sale, website analytic tools, calendars, web browsers, mapping tools, location tracking tools, and telephone and voicemail transcription to the public.

45.  Google Calendar (Google's appointment book service) allows users to create events or RSVP to events created by others.  A single Google Account can set up multiple calendars.

A calendar can be shared with other Google Accounts by the user or made public so anyone can access it.  Users also have the option to sync their device calendar so it is stored in Google Calendar.

46.  Google also offers numerous services which enhance the user's Internet experience, including Google Dashboard, Google Reader, Google News, and Google Groups.  Google News and the now-discontinued Google Reader are website feed aggregators that allowed a user to view website articles and news in one centralized location.  Google Groups are email groups whereby one person can send an email to an email address that serves as the "group," and the message or email is either or both posted to a centralized location and/or sent to everyone who is currently subscribed to the group via email; each group is generally set up using a Google account.

47.  Google also offers a service called Google Hangouts, which allows Google users to communicate by means of video calls, phone or audio calls, or written messages.

48.  Google also offers its own web browser -- Google Chrome -- which can be used instead of other web browsers such as Microsoft Internet Explorer or Mozilla Firefox.  Google Chrome retains a record of a user's browsing history and allows users to save favorite sites as bookmarks for easy access.  If a user is logged into their Google Account on Chrome and has the appropriate settings enabled, their browsing history, bookmarks, and other browser settings may be saved to their Google Account in a record called My Activity.  Users who have a Google Account

can use Google Chrome on multiple devices and can decide which information "syncs" or synchronizes across multiple devices that are running Google Chrome.  Devices that can be synced include computers, Google's own computers called Chromebooks, devices running Google's own Android operating system, or iPhones or iPads (devices made by Apple, Inc. that use Apple's proprietary operating systems).  Users have the option to sync all data across multiple devices, or only certain information by checking certain boxes.

49.  Users can obtain a Google Account by registering with Google.  During the registration process, Google generally ask subscribers to provide certain personal identifying information when registering.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  Google may also maintain a record of changes that are made to the information provided in subscriber records, such as to any other email addresses or phone numbers supplied in subscriber records.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

50.  Evidence of who it is that a user of an account has contacted and for what purpose can also reside in the information likely stored for the SUBJECT ACCOUNT at Google. For example, photographs can be stored not only as attachments

to emails, but they can be linked to a particular contact stored in connection with an email account, they can be stored in connection with a particular "friend" or event on a Google+ account, or they can be stored in a Google Photos (formerly Picasa) web album.  Albums can be compiled for a particular trip or occasion, documenting who was present, when it took place, and where it was -- for example by recovering location information that is sometimes stored in metadata, or what is referred to as "EXIF data" on digital photographs.  Likewise, personal videos can be uploaded to or downloaded from video services such as Google's YouTube.  All of this data can assist in identifying the true identity of the account user and persons with whom the user of the account has been in contact.

51.  Aside from photos, discontinued Google+, Google Plusone, and iGoogle services were social networking services similar to Facebook.  Data residing on Google+, Google Plusone, and iGoogle accounts may provide information regarding the true identity of the person(s) using the SUBJECT ACCOUNT, the identities of persons with whom the user(s) of the SUBJECT ACCOUNT has been in contact, the nature of those contacts, and whether any such contacts were related to the subject matter of the investigation described above.  Furthermore, a user's history that relates to web browsing, web searches, and certain activity related to Google services or applications (or "apps") are stored in an account's Google History, or Google Web & App Activity.

52.   In addition to storing photographs, calendars, and other evidence related to social media, a subscriber can also sign up for other services at Google, such as Google Drive and Google Keep, which allow users to store any kind of documents. Google Drive is a cloud storage service that allows users can store an unlimited number of documents created by Google applications such as Google Docs, Google Sheets, Google Forms, and Google Slides. Users can also upload files to Google Drive, including photos, videos, PDFs, and text documents, until they hit the storage limit.  Users can set up their personal devices to automatically back up files to Google Drive.  Google Drive allows users to share their stored files and documents with up to 100 people and grant those with access the ability to edit or comment.  Google maintains records of changes to documents edited in Google applications.  Google Keep is a cloud-based notetaking service that lets users take notes and share them with other Google users to view, edit, or comment.

53.   A subscriber can also store with Google files in addition to emails or other messages, such as address books, contact or buddy lists, groups, social network links, calendar data, pictures or videos (other than ones attached to emails), notes, and other files, on servers maintained and/or owned by the PROVIDER.  In my training and experience, evidence of who was using an account may be found in such information.

54.   Providers like Google typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date

on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the account.  In addition, email and social media providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the SUBJECT ACCOUNT.

55.  Google also collects and retains data about the location from which Google Account services are accessed on any mobile device.  According to Google, this location data may be associated with the Google Account signed-in or registered to the device if Location Services are activated on the device and the user has enabled certain global settings for their Google Account, such as Location History or Web & App Activity tracking.  The data retained includes precision location data, like latitude and longitude coordinates derived from GPS.

56.  In addition, Google Maps provides a mapping tool that allows users to search for addresses or points of interest, save locations (such as their home and work locations), create custom maps, make changes and edits to public places, "star" locations, and create private labels for locations.  Users can share their real-time location with others through Google Maps by using the

Location Sharing feature.  Users could find and plan an
itinerary using the discontinued Google Trips, whose
functionality is now part of Google Travel.  Google Location
History provides Global Positioning System (GPS) location
information.  All of these services can be used to identify
where an individual is and has been physically located.  Google
also in some instances maintains records of the nearby wireless
or "Wi-Fi" access points (that can be used to connect to the
Internet) or the cellular towers connected to a device that is
accessing a Google Account.

57.  Google offers services which interpret and translate
text, including Google Translate (which allow users to paste
text in one language that will be translated into another) and
Google Translator Toolkit (which includes more functionality and
collaboration), which can translate text in over 100 languages.
The translation service is Internet-based, so it can be used by
the user of the account to translate emails received as well as
websites visited.

58.  Over the last several years, Google has developed a
number of mobile telephone and voicemail technologies, including
the development of the Android mobile operating system, Android
Market, Google Voice, and the discontinued Google Talk.  The
Android operating system is used on the majority of the world's
touch-screen mobile devices and smartphones, and facilitates the
downloading and running of games and applications, sending of
text and voice messages, connecting to and searching the
Internet, and providing of GPS and location services, camera

services for the taking of photographs and videos (including video calling), clock and calendar services, and email services, and storing of contact lists and documents. The Google Play service provides the virtual storefront at which applications can be downloaded and updated. I know from experience that Android applications including these are generally downloaded from the Android Market and Google Play services. Through Google Voice, users can be assigned a telephone number that can be used to make, record, and forward phone calls and send, receive, store, and forward SMS and MMS messages from a web browser, mobile phone, or landline. Google Voice also includes a voicemail service. Google Talk was an instant messaging service that provided both text and voice communication.

59. Google also uses "unique application numbers," which Google uses to record information such as the operating system type and the application version number used to access Google by a particular device. Google maintains these unique application numbers to track and collect information related to a particular device accessing Google services, which is recognized when updating Google services or software on a device using a Google Account.

60. Google can also track users across various devices, services, and "apps." One way that it does so is by assigning a Google Accounts and ID Administration ("GAIA") ID. Google is therefore able to determine when activities are connected to that GAIA ID.

61.  Google also now offers users the ability to exercise certain control over email messages, for example by allowing users to send expiring messages, to require a recipient to insert a password to open a message, to retract access to a sent message, or to control whether a recipient can forward a message.

62.  Depending on whether a user of a Google Account implemented Google's two-factor authentication system (which can require the user to enter both a username and password and a code sent to one's cell phone), Google may also have authentication logs of when the user successfully authenticated or identified him- or herself when logging into an account. Similarly, for certain mobile devices, a password for the specific "app" installed on the mobile device may be generated and used to maintain access.

63.  In some cases, users may communicate directly with Google about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Providers like Google typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

64.  For the foregoing reasons, Attachment B in the requested warrant to Google requires Google to provide information related to any of the above-described Google services used by or through the SUBJECT ACCOUNT, as the user of

the SUBJECT ACCOUNT may have enrolled in new services since the subscriber records were obtained from Google on October 17, 2022.

65.  In my training and experience, providers also keep a record of search queries run by the user of the account, whether searches within the services of the provider for persons, content, or other accounts (such as if a user is trying to find the account of an acquaintance), or broader Internet searches. In some instances, providers may also keep records of which websites or contents were "clicked on" as a result of these searches.  This information is helpful in the context of the case to show the topics about which the user was trying to obtain more information or conduct research, and is relevant for "user attribution" evidence, analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

66.  I have also learned that providers of email and social media services often track the behavior and activities of persons using accounts by using cookies, which are strings of characters and numbers stored on a person's computer on their web browser.  These cookies can often show whether more than one account was accessed by the same computer (and specifically the same web browser), as the provider can recognize that cookie when the same device returns to the service to access an account.

67.  In order to identify other accounts used or maintained by the user of a SUBJECT ACCOUNT, the warrant also calls for the

PROVIDER to disclose both (1) any cookies associated with the
SUBJECT ACCOUNT, i.e., those cookies that were placed on any
computers or web browsers (for example, Internet Explorer or
Google Chrome) used to access the SUBJECT ACCOUNT, and (2) the
identity of any other account in which the same cookie or
cookies used to access the SUBJECT ACCOUNT was/were recognized.
If in the course of the investigation the digital devices used
by the subject(s) of the investigation are found, they can be
searched to determine if the cookies recognized by the provider
are stored on those devices.  The warrant also calls for the
PROVIDER to identify any other accounts accessed by any computer
or web browser using the same cookies as the SUBJECT ACCOUNT by
providing subscriber records and log-in information for those
other accounts (but not to provide the contents of
communications in those other accounts).

     68.  Users of accounts are often required to include an
email account as well as a phone number in subscriber records.
The email account may be an email account hosted at the same
provider, or an account at a different provider.  The email
account is referred to by a number of names, such as a secondary
email account, a recovery email account, or an alternative email
account or communication channel.  That email account is often
used when the identity of the user of the primary account (here,
a SUBJECT ACCOUNT) needs to be verified, for example if a
password is forgotten, so that the provider can confirm that the
person trying to access the account is the authorized user of
the account.  Similarly, the telephone number used in subscriber

records is often used to send a passcode via text (or "SMS")
that must be presented when trying to gain access to an account,
either in a similar scenario where a user forgot his or her
password, or when users implement what is referred to as "two-
factor authentication" (where the password is one factor, and
the passcode sent via text message to a mobile device is a
second).  In either scenario, the user of a primary email
account (a SUBJECT ACCOUNT) and a secondary email account or
phone number listed in subscriber records are very often the
same person, or at least are close and trusted and/or working in
concert.  That is because access to either the secondary email
account or to the phone number listed in subscriber records can
allow access to the primary account.

      69.  Providers of email and social media often maintain,
have access to, and store information related to the location of
the users of accounts they service.  That information may be
obtained by the provider in a number of ways.  For example, a
user may access the provider's services by running an
application on the user's phone or mobile device, which
application has access to the location information residing on
the phone or mobile device, such as Global Positioning System
(GPS) information.  It may also be accessible through "check-in"
features that some providers offer that allow users to transmit
or display their location to their "friends" or "acquaintances"
via the provider.

### V.   INFORMATION STORED BY GOOGLE THAT RELATES TO ANDROID DEVICES

70.   As mentioned above, Google offers a free mobile operating system (OS) product called Android.  When a new device is established running the Android OS, it is assigned an Android ID and if the device has a telephony module, it likely has an International Mobile Equipment Identity (IMEI) number, which may be interchangeable with an Android ID.  Google and other providers of email and social media use various identifiers, such as Global Unique Identifiers or "GUIDs," to track users and the devices users are using as well.

71.   The Android OS will also assign a user-specific "Advertising ID" that can be used by users and developers to control and monetize the applications they develop.

72.   I know from my experience and in talking with FBI employees familiar with the Android developer toolkit that Google stores certain information relating to each Android device that is activated.

73.   Among the information that Google stores are records that might indicate who the owner of the IMEI/Android ID is, such as the Google Account that was used to establish the Android device, Google Accounts accessed by the device, records related to the hardware device the Android OS is operating on, email accounts associated with the IMEI/Android ID, IP addresses used by the device and used to access the Google Account, search queries performed on the Android device, web browsing performed on the Android device, machine cookie information for the

Android device, images used to establish the Google "Face Unlock" feature, phone call logs, text message content, stored voicemails, contact lists stored on the device, stored photographs, the phone number of the device, applications or "apps" downloaded by the device, apps currently and historically accessed by the device, bookmarks, favorites lists, memos and files saved to the device, and device security settings. Some of these applications or "apps" store or back-up data remotely to Google, rather than only storing it locally on the device or phone itself.

74. Additionally, Google allows users to sync certain applications to the Android account that can be used to identify the identity of the user of the device.

75. Google also stores information related to the location of the Android device, including clock and time zone settings, Global Positioning System (GPS) location history, language codes, and Google Maps location information.

76. Google provides cloud services which allow a user to save content on the Android device to the cloud; in the event the device malfunctions the user is able to quickly recover their data and information from this cloud back-up image.

77. Google also allows Android device users to use Google Drive to backup certain data from their device. Android backups on Google Drive may include mobile application data, device settings, file downloads, and SMS messages.

## VI.   <u>BACKGROUND ON THE SEIZURE OF DIGITAL EVIDENCE FROM THE</u>
<u>PROVIDER</u>

78.   I know from my training and experience that the
complete contents of an account may be important to establishing
the actual user who has dominion and control of that account at
a given time.  Accounts may be registered in false names or
screen names from anywhere in the world with little to no
verification by the service provider.  They may also be used by
multiple people.  Given the ease with which accounts may be
created under aliases, and the rarity with which law enforcement
has eyewitness testimony about a defendant's use of an account,
investigators often have to rely on circumstantial evidence to
show that an individual was the actual user of a particular
account.  Only by piecing together information contained in the
contents of an account may an investigator establish who the
actual user of an account was.  Often those pieces will come
from a time period before the account was used in the criminal
activity.  Limiting the scope of the search would, in some
instances, prevent the government from identifying the true user
of the account and, in other instances, may not provide a
defendant with sufficient information to identify other users of
the account.  Therefore, the contents of a given account,
including the email addresses or account identifiers and
messages sent to that account, often provides important evidence
regarding the actual user's dominion and control of that
account.  For the purpose of searching for content demonstrating
the actual user(s) of a SUBJECT ACCOUNT, I am requesting a

warrant requiring the PROVIDER to turn over all information
associated with the SUBJECT ACCOUNT with the date restriction
included in Attachment B for review by the search team.

79.   Relatedly, the government must be allowed to determine
whether other individuals had access to the SUBJECT ACCOUNT.  If
the government were constrained to review only a small
subsection of an account, that small subsection might give the
misleading impression that only a single user had access to the
account.

80.   I also know based on my training and experience that
criminals discussing their criminal activity may use slang,
short forms (abbreviated words or phrases such as "lol" to
express "laugh out loud"), or codewords (which require entire
strings or series of conversations to determine their true
meaning) when discussing their crimes.  They can also discuss
aspects of the crime without specifically mentioning the crime
involved.  In the electronic world, it is even possible to use
pictures, images and emoticons (images used to express a concept
or idea such as a happy face inserted into the content of a
message or the manipulation and combination of keys on the
computer keyboard to convey an idea, such as the use of a colon
and parenthesis :) to convey a smile or agreement) to discuss
matters.  "Keyword searches" would not account for any of these
possibilities, so actual review of the contents of an account by
law enforcement personnel with information regarding the
identified criminal activity, subject to the search procedures

set forth in Attachment B, is necessary to find all relevant evidence within the account.

81.   This application seeks a warrant to search all responsive records and information under the control of the PROVIDER, which is subject to the jurisdiction of this court, regardless of where the PROVIDER has chosen to store such information.

82.   As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

a.   I make that request because I believe it might be impossible for a provider to authenticate information taken from the SUBJECT ACCOUNT as its business record without the original production to examine.  Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case.  If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from the SUBJECT ACCOUNT.

b.   I also know from my training and experience that many accounts are purged as part of the ordinary course of

business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.  Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

## VII. <u>REQUEST FOR NON-DISCLOSURE</u>

83.  Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDER not to notify any person, including the subscriber(s) of the SUBJECT ACCOUNT, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the requested warrant is signed by the magistrate judge, or such later date as may be set by the Court upon application for an extension by the United States.  There is reason to believe that such notification will result in: (1) flight from prosecution; (2) destruction of or tampering with evidence; and (3) otherwise seriously jeopardizing the investigation.  This criminal investigation remains ongoing and neither public nor known to all of the targets of the investigation.  Furthermore, all of the targets identified thus far reside outside of the United States.  Based on my training

and experience, I believe notification of the existence of the warrant will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, or notify confederates.

### VIII.    CONCLUSION

84.    Based on the foregoing, I request that the Court issue the requested warrant.  The government will execute this warrant by serving the warrant on the PROVIDER.  Because the warrant will be served on the PROVIDER, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

ERIC T. BROWN
_____
Eric T. Brown
Special Agent - HSI


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
_____, 2022.


_____
HONORABLE JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

### **PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the SUBJECT ACCOUNT identified as tianyy766@gmail.com, associated with Google Account ID 465899734138, that is within the possession, custody, or control of Google LLC, a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, California, regardless of where such information is stored, held, or maintained.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

**I. SEARCH PROCEDURES**

1.    The warrant will be presented to personnel of Google
LLC (the "PROVIDER"), who will be directed to isolate the
information described in Section II below.

2.    To minimize any disruption of service to third
parties, the PROVIDER's employees and/or law enforcement
personnel trained in the operation of computers will create an
exact duplicate of the information described in Section II
below.

3.    The PROVIDER's employees will provide in electronic
form the exact duplicate of the information described in Section
II below to the law enforcement personnel specified below in
Section IV.

4.    With respect to contents of wire and electronic
communications produced by the PROVIDER (hereafter, "content
records," see Section II.10.a. below), law enforcement agents
and/or individuals assisting law enforcement and acting at their
direction (the "search team") will examine such content records
pursuant to search procedures specifically designed to identify
items to be seized under this warrant.  The search shall extract
and seize only the specific items to be seized under this
warrant (see Section III below).  The search team may use
forensic examination and searching tools, such as "EnCase" and
"FTK" (Forensic Tool Kit), which tools may use hashing and other
sophisticated techniques.  The review of the electronic data may

i

be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

6.   The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.   Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court.  Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.    The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.    Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.    <u>INFORMATION TO BE DISCLOSED BY THE PROVIDER</u>

10.    To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.    All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT, limited to that which occurred between January 8, 2022[1] and the date of this warrant,[2] including:

i.    All emails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored

---

[1] The date the SUBJECT ACCOUNT was created.

[2] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

or preserved copies of messages sent to and from the account, draft messages, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each email or message (including the actual IP addresses of the sender and recipients of the emails), and any related documents or attachments.

ii.  All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

iii. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

b.  All other records and information, including:

i.  All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or email addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment,

including detailed billing records, and including any changes made to any subscriber information or services, including specifically changes made to secondary email accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the following accounts:

(I)  the SUBJECT ACCOUNT, and

(II) any other account associated with the SUBJECT ACCOUNT by means of sharing a common secondary, recovery, or alternate email address listed in subscriber records for the SUBJECT ACCOUNT or by means of sharing a common phone number or SMS number listed in subscriber records for the SUBJECT ACCOUNT.

ii.  Any and all logs of user activity and user agent string, including:  web requests or HTTP requests; any logs containing information such as the Requestor's IP address, identity and user ID, date and timestamp, request URI or URL, HTTP protocol version, referrer, and other user agent string information; login tracker logs; account management logs; and any other information concerning other email or social media accounts accessed by or analytics related to the SUBJECT ACCOUNT.

iii. Any and all cookies used by any computer or web browser associated with the SUBJECT ACCOUNT, including the IP addresses, dates, and times associated with the recognition of any such cookie;

iv.  All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made.

v.  Any information identifying the device or devices used to access the SUBJECT ACCOUNT, including any Android ID, Advertising ID, unique application number, hardware model, operating system version, unique device identifier, Global Unique Identifier or "GUID," serial number, mobile network information, phone number, device serial number, MAC address, Electronic Serial Number ("ESN"), Mobile Electronic Identity Number ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Number ("MIN"), Subscriber Identity Module ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifier ("IMSI"), International Mobile Equipment Identity ("IMEI"), or Apple advertiser ID or ID for advertisers ("IDFA") or Google's AAID or any other advertiser ID, and any other information regarding the types of devices used to access the SUBJECT ACCOUNT or other device-specific information, including the device type, brand name, device mode or operating system, and first and last times that a device were observed.

vi.  Any information showing the location of the user of the SUBJECT ACCOUNT, including while sending or

receiving a message using the SUBJECT ACCOUNT or accessing or logged into the SUBJECT ACCOUNT.

III. **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

11.  For the SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

a.  All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1030 (Computer Fraud), 1343 (Wire Fraud), 1956 (Money Laundering), 1957 (Monetary Transactions in Criminally Derived Property), or a conspiracy to commit the same, (the "Subject Offenses"), namely:

i.  Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

ii.  Information related to how and when the SUBJECT ACCOUNT was accessed or used;

iii. Information related to the purchase, registration, maintenance and/or administration of https://defi.etc-defi909.xyz or other similar domains which are spoofed websites of Compound Labs doing business as Compound DeFi;

iv.  Information related to victims of the liquidating mining scam, including known victims M.A., I.A., B.J., S.B. and R.N. and unidentified victims.

v.  Information related to the proceeds of liquidity mining scams, including the creation and use of bank,

financial and cryptocurrency accounts, and records related to cryptocurrency, bank, and wire transactions;

vi.   Records, documents, programs, applications, or materials referring to or containing the personal identifying information of any conspirator, such as names, addresses, phone numbers, credit and debit card numbers, security codes, bank account and other financial institution account numbers, Social Security numbers, and email addresses.

vii.  Information related to the location, storage, or concealment of cash, money instruments, virtual currency, or other money equivalents;

viii.    Information related to co-conspirators engaged in the Subject Offenses, which could include information relating to their identities, whereabouts, communications, and methods of contact and communication.

b.   All records and information described above in Section II.10.b.

## IV.   PROVIDER PROCEDURES

12.  IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  The PROVIDER shall send such information to:

Special Agent Eric Brown
501 W. Ocean Blvd, Suite 7200, Long Beach, CA 90802
Phone: 562-519-8683
Email: eric.t.brown@ice.dhs.gov

13.   IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant. IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b), that the PROVIDER shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant, until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date this warrant is signed by the magistrate judge or such later date as may be set by the Court upon application for an extension by the United States.  Upon expiration of this order, at least ten business days prior to disclosing the existence of the warrant, the PROVIDER shall notify the agent identified in paragraph 12 above of its intent to so notify.